**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

_____

SUPERVALU INC., a Delaware corporation,

        Plaintiff,

v.                        **MEMORANDUM OF LAW & ORDER**
                                  Civil File No. 04-2936 (MJD/SRN)

ASSOCIATED GROCERS, INC.
a Washington corporation,

        Defendant.

_____

Craig D. Diviney, Emily L. Fitzgerald, Thomas W. Tinkham, Todd R. Trumpold, and Colin Wicker, Dorsey & Whitney, LLP, Counsel for Plaintiff.

Brian D. Buckley and Stellman Keehnel, DLA Piper Rudnick Gray Cary, and Craig S. Coleman, Jonathan W. Dettmann, Richard A. Duncan, Peter C. Hennigan, and Brian B. O'Neill, Faegre & Benson, Counsel for Defendant.

_____

## I.    INTRODUCTION

This matter is before the Court on Plaintiff SuperValu Inc.'s Motion for Partial Summary Judgment [Docket No. 77] and on Defendant Associated Grocers, Inc.'s Motion for Summary Judgment [Docket No. 82].  The Court heard oral argument on February 3, 2006.

## II.     BACKGROUND

### A.     Factual Background

Plaintiff SuperValu Inc. is a Delaware corporation based in Eden Prairie, Minnesota.  Defendant Associated Grocers, Inc. ("AG"), is a Washington corporation based in Seattle, Washington.  Both are large wholesale grocers and competitors.  This case relates to their competition for the business of a line of grocery stores owned by Haggen, Inc., in the Pacific Northwest.

In December 1999, Haggen signed a five-year supply agreement with SuperValu.  Haggen represented a substantial portion of SuperValu's business in the Northwest: between $200 and $300 million of annual revenue and approximately one-third of SuperValu's total business in the Northwest.  Beginning in 2001, Haggen expressed dissatisfaction with SuperValu's performance under the 1999 Supply Agreement.  In January 2002, Haggen informed AG that its 1999 Supply Agreement would expire in 2004.

From October 2002 through May 2004, SuperValu and AG engaged in negotiations regarding a possible joint venture entitled "Project Partner."  Under the proposed agreement, SuperValu and AG would consolidate their underused warehouse space in the Pacific Northwest.

At the beginning of their negotiations, on October 24, 2002, SuperValu and AG entered a Mutual Confidentiality and Non-Disclosure Agreement

2

("Confidentiality Agreement") providing that neither party would disclose or use confidential information received from the other party.  The Confidentiality Agreement also states: "So long as the confidentiality provisions of this Agreement are followed, nothing in this Agreement shall be deemed to restrict the right of either party to compete, directly or indirectly, against the other party." (Confidentiality Agreement ¶ 4.)

In May 2003, SuperValu and AG drafted a non-binding Proposed Term Sheet setting a July 2003 date for signing a definitive agreement.  On June 26, 2003, SuperValu and AG signed an Information Exchange Agreement in order to exchange information to conduct due diligence and evaluate the proposed joint venture.  The Information Exchange Agreement provides:

> Evaluation Materials shall not be used by the Receiving Company for any anticompetitive purpose, for any unlawful purpose, for the purpose of gaining any competitive advantage over the Producing Company, or for any other purpose that would be detrimental to the Producing Company.  This obligation shall be perpetual.

(Information Exchange Agreement ¶ 4.)  It also states that the parties "wish to avoid violations of the antitrust laws and the appearance of such violations."  (Id. ¶ D.)

Neither party ever exchanged customer-specific information during Project Partner negotiations, such as supply agreements or margin information on particular customers, because they never reached the final phase of due diligence.

 However, SuperValu provided detailed information on its Tacoma distribution center, including information on sales, costs, and profitability by product category. The Tacoma distribution center primarily serviced Haggen and the military, so it may have been possible to calculate certain statistics for the Haggen account based on that information.

In October 2003, AG and Haggen met to discuss a possible supply agreement and executed a confidentiality agreement covering their negotiations.

In early 2004, AG inquired about the profitability of SuperValu's Haggen account and about SuperValu's plans to renew its supply agreement with Haggen. At one point, SuperValu told AG that it wanted to inform Haggen of the Project Partner negotiations because it believed it would be in a better position to win Haggen's contract after a joint venture with AG had been formed.

Between December 2003 and February 2004, Haggen contacted Larry Langsweirdt, SuperValu's President of the Northwest Region, for a price comparison for its new 2004 supply agreement.  Haggen explained that it was seeking prices from three different wholesalers.  Langsweirdt assumed that AG was competing for the Haggen contract because SuperValu, Unified Western Grocers ("UWG"), and AG were the only three wholesalers in that territory.  Janel Haugarth, SuperValu's Northern Region President, also thought that the other two wholesalers were AG and UWG.  Despite receiving the early request for a bid,

Mike Jackson, Executive Vice President of Wholesale for SuperValu, testified that SuperValu did not expect an early closure of renewal negotiations with Haggen based on past negotiations with it.

Between December 2003 and February 2004, Haggen told SuperValu that it was negotiating with AG for AG to service its meat business.  In mid-February 2004, Haggen informed SuperValu that it was moving its meat business from SuperValu to AG.  This represented a loss of tens of millions of dollars in revenue to SuperValu.

On February 27, 2004, SuperValu and AG prepared a modified Proposed Term Sheet stating that the definitive agreement on the joint venture would be signed by August 1, 2004.  According to SuperValu, AG then slowed down the Project Partner deal by failing to provide timely due diligence information and then failing to return phone calls.

In late February 2004, Haggen told AG that it wanted to explore having AG as Haggen's primary supplier.  In early March 2004, AG's Chief Financial Officer, John Carrosino, began developing a pricing proposal for Haggen.

AG knew that if SuperValu lost Haggen's business, SuperValu's contribution to the joint venture would be decreased.  Thus, AG viewed participating in the joint venture and obtaining the Haggen contract as mutually exclusive options.  If AG gained Haggen as a customer, that would increase its warehouse utilization to

almost one hundred percent, and it would no longer have any need to enter the joint venture with SuperValu.

On March 5, 2004, SuperValu and AG signed a Letter of Intent, which states:

> This letter is intended to provide the basis for the preparation of definitive agreements setting forth the terms and conditions of the transactions described in this letter.  Except for the agreements and obligations contained in Section 2, <u>Confidentiality</u>, Section 3, <u>Public Announcements</u>, and Section 4, <u>Miscellaneous Provisions</u>, this letter is not a binding agreement between the parties and represents only the parties' current good-faith intention to negotiate and enter into the definitive agreements.  Neither party shall have any liability to the other parties if such party fails to execute the definitive agreements for any reason (other than liabilities which may arise under the sections listed above).

(Letter of Intent ¶ 5.)  At the time that it signed the Letter of Intent, AG knew that it also intended to pursue negotiations with Haggen.  SuperValu solicited many of AG's customers during the Project Partner negotiations, both before and after signing the Letter of Intent.  It sought business from Sinnett's Market Place during fall 2003, Brown & Cole in March or April 2004, Payless Markets in March 2004, Saar's Market Place in April 2004, and Larry's Markets in May 2004.

During March 2004, both AG and SuperValu engaged in negotiations with Haggen.  On March 8, AG participated in a conference call with Haggen regarding a potential supply agreement.  By March 18, AG had shared a draft term sheet with Haggen.

On March 15, SuperValu met with Haggen to discuss their supply relationship.  President and CEO of Haggen, Dale Henley, called Jackson before their March 15 meeting and told him that SuperValu should come to the meeting with a plan regarding renewal of the supply agreement.  However, SuperValu presented no written plan to Haggen until more than a month later.  On April 20, SuperValu proposed a new rebate schedule to Haggen, attempting to retain Haggen's business and regain Haggen's meat business.  Of the three proposals received by Haggen through the price comparison process, SuperValu's proposal was by far the most expensive, UWG's was the cheapest, and AG's was slightly more expensive that UWG's.

On April 23, AG and Haggen had reached an agreement in principle, and many of the key closing documents had been prepared.  AG's internal correspondence reveals that at that time, it wanted Haggen to commit to a supply agreement quickly.  AG's strategy was to consummate a transaction with Haggen and then deal with the repercussions with SuperValu later.

By April 26, AG had concluded that the Haggen deal would be more profitable than Project Partner.  On April 27, Haggen sent new volume projections and product mixes to AG for a cost estimate under AG's proposed model.

By April 29, Haggen had informed SuperValu that it had submitted the highest bid in the price comparison.

7

SuperValu knew that AG's board would make a decision on Project Partner around May 1, 2004.  On May 5, SuperValu internally identified twelve remaining open issues in the Project Partner negotiations.  The next day, AG's board met regarding the Project Partner negotiations and the Haggen supply agreement. The board voted to terminate the Project Partner negotiations and continue to negotiate with Haggen.

By May 13, Haggen had told SuperValu that its bid exceeded AG's by $6 million per year.  That day, SuperValu sent AG a letter stating that AG had breached its duties under the joint venture negotiations by attempting to obtain the Haggen contract.  On May 14, AG responded to SuperValu's accusations and formally informed SuperValu of its decision to terminate Project Partner negotiations.  AG represents that it waited over a week after the board meeting to inform SuperValu of its decision to terminate negotiations because it wanted to do so in a "formal professional" manner.

On May 16, 2004, Haggen asked SuperValu to submit another bid. SuperValu CEO Jeffrey Noddle and others met with Haggen on May 17 and 18 to discuss submitting a new proposal.  SuperValu believed that it had already lost Haggen's business to AG and that, as a matter of business judgment, SuperValu could not attempt to underbid AG.  Even meeting AG's bid would result in a loss of $7.1 million per year to SuperValu.

SuperValu submitted two alternative proposals to Haggen: a two-year supply agreement with help assisting Haggen convert to a self-supply model and a five-year renewal of the 1999 Supply Agreement.  Langsweirdt, SuperValu's team leader of the effort to extend the Haggen supply contract, testified that the Project Partner negotiations never prevented SuperValu from making its best offer to Haggen.  However, Haggen rejected SuperValu's second proposal.  According to Haggen's President and CEO, SuperValu never submitted an acceptable bid and never addressed Haggen's concern about its long-term commitment to the Northwest.

On June 15, 2004, Haggen and AG entered into a formal supply agreement.

**B.    Procedural Background**

SuperValu filed this lawsuit against AG on June 10, 2004.  In SuperValu's First Amended Complaint, it asserts three claims against AG: Count I: Breach of Contract - Duty to Negotiate in Good Faith, Count II: Breach of Contract - Duty of Confidentiality & Nonuse, and Count III: Misrepresentation.  In AG's Answer, it denies the claims and asserts five groups of affirmative defenses: failure to state a claim upon which relief can be granted; doctrines of estoppel, waiver, laches, and unclean hands; statute of frauds; failure to mitigate damages and lack of damage causation; and failure of consideration, mutual mistake, mutual misunderstanding, and failure of mutual assent.  The Court has previously denied

AG's motion to dismiss for lack of personal jurisdiction, motion to dismiss for failure to state a claim, and motion to transfer venue.  The Court's Order established that Washington state law applies to SuperValu's claims.

AG now seeks summary judgment on all of SuperValu's claims.  SuperValu seeks summary judgment on the following AG affirmative defenses: 1) estoppel, waiver, laches, and unclean hands; 2) statute of frauds; and 3) failure of consideration, mutual mistake, mutual misunderstanding, and failure of mutual assent.  The defenses that are the subject of SuperValu's motion are directed only to Counts I and III of SuperValu's First Amended Complaint.

## III.   DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion."  Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.     AG's Motion for Summary Judgment on SuperValu's Claims

**1.      Count I: Breach of Contract - Duty to Negotiate in Good Faith**

SuperValu alleges that AG breached its duty to negotiate in good faith, required by the Letter of Intent, by secretly attempting to enter into a supply contract with Haggen while still outwardly pursuing Project Partner negotiations with SuperValu, knowing that consummation of the Haggen deal would destroy the possibility of a joint venture with SuperValu. AG asserts that it had no obligation to disclose competitive activities to SuperValu, and any such disclosure would have been a per se antitrust violation. Additionally, it claims that its failure to disclose its negotiations with Haggen or to immediately inform SuperValu of its decision to terminate Project Partner negotiations did not cause damage to SuperValu because SuperValu simply failed to produce a bid satisfactory to Haggen.

**a.      Existence of a Duty to Negotiate in Good Faith**

Washington law recognizes that parties may contract to negotiate in good faith:

> In a contract to negotiate, the parties exchange promises to conform to a specific course of conduct during negotiations, such as negotiating in good faith, exclusively with each other, or for a specific period of time. Under a contract to negotiate, the parties do not intend to be bound if negotiations fail to reach ultimate agreement on the substantive deal. . . . [N]o breach occurs if the parties fail to reach agreement on the substantive deal. The contract to negotiate is breached only when one party fails to conform to the specific

course of conduct agreed upon.

Keystone Land & Dev. Co. v. Xerox Corp., 94 P.3d 945, 948 (Wash. 2004) (en

banc).  In this case, as indicated in the Court's Order denying AG's motion to

dismiss, the Letter of Intent creates a contract to negotiate in good faith.  The

Court must next determine the contours of that obligation.

### b.    Whether Good Faith Requires Disclosure of Competitive Activities

The Court concludes that the good-faith clause did not require AG to

disclose competitive activities to SuperValu.  "[T]he scope of the duty to negotiate

in good faith . . . is defined solely by the terms of the letter of intent."  A/S

Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Group, Inc.,

873 F.2d 155, 160 n.2 (7th Cir. 1989).  A generalized duty to negotiate in good

faith, as found in the language in the Letter of Intent, does not require disclosure

of competing negotiations.  See, e.g., PSI Energy, Inc. v. Exxon Coal USA, Inc., 17

F.3d 969, 972 (7th Cir. 1994) (noting that a party's contractual "obligation to

negotiate in good faith is not an obligation to be kind to one's trading partner or

to refrain from taking commercial advantage of the contractual provisions one has

negotiated"); Schwanbeck v. Federal-Mogul Corp., 578 N.E.2d 789, 798-99 (Mass.

Ct. App. 1991) (holding that "[m]ore open dealing . . . concerning the parallel

negotiations with [a competitor] may have been better business manners, but the

law does not require so precious a standard" and that the business had "satisfied

the obligation to negotiate in good faith" required by the parties' letter of intent),

rev'd on other grounds, 592 N.E.2d 1289 (Mass. 1992).

Even if, in the abstract, a duty to negotiate in good faith could be construed to require that AG postpone negotiations with Haggen until after Project Partner talks were completed, inform SuperValu of the Haggen negotiations, or terminate the Project Partner talks, the clear contract language in this case demonstrates that the parties did not intend such an obligation. Paragraph Four of the Confidentiality Agreement, incorporated by reference into the Letter of Intent, explicitly provides that the parties would continue to compete with one another while they negotiated Project Partner. The language permitting the parties to compete is not limited to only allow competition for small customers and does not require the parties to inform each other when they do compete. Thus, the language allowed AG to compete for Haggen's business without informing SuperValu of its actions. In fact, the evidence shows that SuperValu actively pursued AG's customers throughout the Project Partner negotiations. The Court concludes that the Letter of Intent's obligation to negotiate in good faith did not bar AG from pursuing a contract with Haggen while, at the same time, negotiating with SuperValu.

### c.　　Antitrust Law

The Court's conclusion is further bolstered by the antitrust implications of

an agreement not to compete.  An agreement to notify one another of any intent to compete for each other's customers or to refrain from such competition altogether would have been a per se violation of the Sherman Act.  See United States v. Topco Assocs., Inc., 405 U.S. 596, 612 (1972) (holding that territorial and customer allocation scheme among sellers of private label groceries violated antitrust laws).  Courts cannot enforce illegal contract provisions.  Amtruck Factors v. Int'l Forest Prods., 795 P.2d 742, 749 (Wash. Ct. App. 1990).  Further, the Information Exchange Agreement stated that the parties intended "to avoid both violations of the antitrust laws and the appearance of such violations."

### d.    AG's Notification of Rejection of Joint Venture

AG did not notify SuperValu that its board had formally rejected the joint venture until May 14, eight days after its board voted to do so.  SuperValu asserts that this delay violated the duty to negotiate in good faith.  It implies that if AG had immediately notified SuperValu of the board vote, SuperValu would have successfully bid on the Haggen contract.

"A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant."  Northwest Indep. Forest Mfrs. v. Dept. of Labor & Indus., 899 P.2d 6, 9 (Wash. Ct. App. 1995) (citation omitted).  SuperValu argues that the contractual duty of good faith prohibited AG from taking an action that made Project Partner

infeasible - namely, agreeing to pursue a deal with Haggen and terminate Project Partner negotiations.  The board vote signified AG's decision to cease to continue to negotiate in good faith with SuperValu.  Even if the Letter of Intent did require AG to immediately inform SuperValu of AG's decision to pursue Haggen at the exclusion of SuperValu, SuperValu's breach of contract claim fails because it cannot show that AG's actions caused it harm.  SuperValu has offered no specific evidence that it would have presented a more successful offer to Haggen had it known of AG's actions earlier.

By February 2004, SuperValu knew that Haggen was transferring its meat business to AG; by that time, SuperValu also knew that Haggen was soliciting a price comparison from three wholesalers and assumed that AG was one of those wholesalers; SuperValu submitted its own bid to Haggen on April 20, 2004; and by April 29, 2004, SuperValu knew that it had submitted the highest bid in Haggen's cost comparison.  By May 13, it knew that AG's Haggen proposal was $6 million lower than SuperValu's.  After SuperValu had full knowledge of AG's competitive activities and the end of the Project Partner negotiations, it still failed to submit an acceptable bid to Haggen, although it met with Haggen and submitted two new proposals before AG and Haggen executed their formal agreement on June 15, 2004.  SuperValu's CEO made a business judgment decision that SuperValu could not match AG's low bid.  Further, SuperValu

admitted that Project Partner discussions did not prevent SuperValu from making its best proposal to Haggen.  There is no evidence that SuperValu's offer to Haggen would have been more successful or that Haggen's response would have been more favorable had AG informed SuperValu of its board's decision on May 6 instead of on May 14.

The Court grants summary judgment to AG on Count I.  SuperValu cannot show that AG had a duty to inform it of the Hagen negotiations prior to arriving at an agreement with Hagen that made the joint venture unworkable.  The Confidentiality Agreement explicitly permitted the parties to compete with one another and a contractual provision to the contrary would have run afoul of antitrust laws.  Finally, SuperValu cannot show that AG's delay in informing it of the board decision caused damages.

### 2.    Count II: Breach of Contract-Duty of Confidentiality & Nonuse

The Confidentiality Agreement and the Information Exchange Agreement prohibit SuperValu and AG from disclosing or using each other's confidential information to gain competitive advantage.  SuperValu asserts that there are two incidents of AG's prohibited use of confidential information to prepare its bid to Hagen: 1) a March 10, 2004 email from the head of AG's Project Partner negotiations, Robert Hoyt, to John Carrosino, AG's CFO, attaching financial

information regarding SuperValu's sales and margins at its Tacoma warehouse

and 2) a spreadsheet of sales information for SuperValu's Tacoma warehouse with

an April 14, 2004 print date.  SuperValu also claims that AG used its confidential

information to compete for military contracts and to consider modifying its sell

plan strategy.

### a.  Use of Information for Haggen Proposal

#### i.  Whether AG "Used" Confidential Information

AG asserts that the email and attachment and the April 14 spreadsheet

contain no information specific to Haggen and that Haggen already provided AG

with all information relevant to its bid.  The Court concludes that this issue must

be resolved by a jury.  AG correctly notes that the spreadsheets make no explicit

reference to Haggen.  However, Hoyt stated in his March 10 email to the person

creating the Haggen proposal that the attached information gave "some

comparitive prospective [sic] re Haggen pricing analysis."  The spreadsheet

attached to the email and the April 14 spreadsheet both contain information

regarding SuperValu's Tacoma distribution center, a significant portion of which

served Haggen.  There is evidence that, because Haggen was such a large

SuperValu customer, AG could roughly estimate the terms of Haggen's SuperValu

account from the general information on SuperValu's Tacoma business.

AG further argues that even if the email and spreadsheet contained

potentially useful information, there is insufficient evidence that it did, in fact, use that information.  Carrosino testified that he did not use that email when formulating the Haggen proposal because it was irrelevant.  In fact, he had already formulated the initial yields and pricing for the Haggen proposal by March 4, 2004.  However, he also admits that when he received the email on March 10, he was still working on the Haggen pricing analysis and had not yet presented a pricing proposal to Haggen.  Additionally, the day after the printing of the April 14 spreadsheet, Carrosino submitted a memorandum to AG's president estimating AG's likely gross profit margin after the Haggen deal.  Finally, the spreadsheets list profit margins by product categories and freight fees by category, and AG's profit margins in its final agreement with Haggen are consistently lower than SuperValu's 1999 Supply Agreement with Haggen.

There is strong evidence that AG intended to use SuperValu's information to prepare the Haggen bid: Hoyt specifically wrote that SuperValu's Tacoma warehouse spreadsheet should help Carrosino with the Haggen pricing analysis. As the Eighth Circuit has noted, "[i]t is well settled that the existence of a plan to do a given act is relevant to show that thereafter the act was in fact done." Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 866 (8th Cir. 2004) (citation omitted).  Additionally, Carrosino's testimony and notes from an August 2003 internal meeting regarding AG's pursuit of Haggen's perishables business

indicate that he believed that knowledge of SuperValu's gross profit margins on its Haggen business would be useful in preparing a competitive bid for Haggen.  AG was interested in SuperValu's gross profit margins because AG wanted to ensure that its bid to Haggen was not more expensive that Haggen's current arrangement with SuperValu.

SuperValu has presented evidence that AG obtained confidential information on SuperValu's Tacoma warehouse through Project Partner negotiations; that this information could be used to determine aspects of SuperValu's pricing arrangement with Haggen; that AG valued that information in preparing a bid for Haggen; that AG intended to use that information in preparing the Haggen bid; and that AG's Haggen bid was consistently lower that SuperValu's contractual arrangement with Haggen in every product category.  These facts could give rise to the inference that AG used SuperValu's confidential information in violation of its contract.  The Court concludes that SuperValu has raised a genuine issue of material fact regarding whether AG used its confidential information in preparing its bid to Haggen.

### ii.   Whether AG's Use Caused Damage to SuperValu

AG claims that even if it used SuperValu's confidential information, SuperValu cannot show that AG's actions caused it damages.  The Court disagrees.

The fact that AG thought that SuperValu's Tacoma warehouse information would help it prepare a winning bid, combined with the fact that its winning bid was lower than SuperValu's 1999 contract in each product category may give rise to an inference that AG's actions contributed to SuperValu's loss of the Haggen contract. While SuperValu ultimately was financially unable to match AG's bid, it is left for the jury to decide whether AG would have made the successful bid in the first place without the use of SuperValu's confidential information.

### b.    Military Supply Business

SuperValu also argues that AG used its confidential information to cultivate its own military supply business. SuperValu supplied the military in the Northwest. Initially, AG did not want to include the military business in the proposed Project Partner joint venture because it did not believe it was profitable, thought it was logistically cumbersome, and did not understand it. During the Project Partner negotiations, SuperValu attempted to persuade AG to include the military business by educating it on the military commissary business and by providing confidential information. SuperValu's disclosures and the work of an AG consultant helped allay some of AG's concerns regarding military business, and it explored the idea of attempting to supply the military on its own. AG eventually rejected that idea and never proposed any supply agreement to the military.

SuperValu has presented evidence that AG improperly used SuperValu's

20

confidential information to internally explore entering the military supply business.  However, SuperValu cannot show that AG's use of its military information caused any damage to SuperValu.  It presents no evidence that AG's actions injured SuperValu, and AG never even attempted to compete for the military's business.  SuperValu cannot pursue this claim to the extent that it is based on the military information.

### c.  Sell Plan Strategy

SuperValu also asserts that AG used its confidential sell plan information to modify its own sell plan to customers.  Because SuperValu has not alleged or shown any damages caused by AG's actions - or that AG even incorporated information from SuperValu into its own sell plan - SuperValu cannot pursue this claim to the extent that it is based on the sell plan information.

### 3.  Count III: Misrepresentation

### a.  Introduction

SuperValu asserts that AG committed misrepresentation by failing to immediately disclose that its board had decided to abandon Project Partner negotiations after AG had told SuperValu that it was willing to negotiate and that the joint venture was a possibility.  In order to succeed on a claim of misrepresentation, SuperValu must prove nine elements:

> (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it

should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.

Stiley v. Block, 925 P.2d 194, 204 (Wash. 1996) (en banc). Promises of future conduct cannot support a claim for misrepresentation; "[a] false representation as to a presently existing fact is a prerequisite to a misrepresentation claim." Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP, 40 P.3d 1206, 1219 (Wash. Ct. App. 2002).

### b.    Fraud Based on Representation of a Future Event

AG asserts that SuperValu's misrepresentation claim should be dismissed because fraud cannot be predicated on a representation of a future event, such as the intent to enter into a joint venture. SuperValu responds that it is not claiming misrepresentation based on AG's promises to form a joint venture in the future. Instead, its claim is based on AG's failure to disclose its change of position about forming a joint venture with SuperValu. It asserts that AG had previously made two representations to it: that it was willing to negotiate a potential joint venture and that there was a possibility that the parties could conclude the joint venture. SuperValu claims that, at a minimum, AG was obligated to promptly disclose its board's decision to discontinue joint venture talks. By not revealing the vote, AG misled SuperValu into believing that AG was still willing to negotiate and that the joint venture was still possible. SuperValu's fraud claim is not based on

22

representation of a future event.

###   c.   **Special Relationship Between the Parties**

SuperValu's misrepresentation claim is based on AG's silence during the time after the board vote.  "If there is a special relationship between the parties, such that the law imposes an affirmative duty to disclose material information, silence may be sufficient to establish fraudulent concealment."  Giraud v. Quincy Farm & Chem., 6 P.3d 104, 110 (Wash Ct. App. 2000).

"Some type of special relationship must exist before the duty [to disclose] will arise."  Colonial Imports, Inc. v. Carlton Northwest, Inc., 853 P.2d 913, 917 (Wash. 1993) (en banc).  When the parties are sophisticated business entities engaged in arm's length negotiations, there is no duty to disclose.  Liebergesell v. Evans, 613 P.2d 1170, 1175 (Wash. 1980) (en banc) ("Generally, participants in a business transaction deal at arm's length; it has been said that an individual has no particular duty to disclose facts nor any particular right to rely on the statements of the party with whom he contracts at arm's length [unless a fiduciary relationship exists].").

SuperValu asserts that even in the absence of a special relationship, the Restatement of Torts provides a duty for AG to disclose newly acquired information to SuperValu in order to prevent previous representations from being misleading or untrue.  The Restatement (Second) Torts § 551(2)(c) provides:

23

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

* * *

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so . . .

This Restatement is inapplicable because it is undisputed that AG disclosed its board's decision to terminate Project Partner before any joint venture was consummated.

AG notes that the Confidentiality Agreement explicitly provides that no fiduciary relationship exists between AG and SuperValu.  In fact, SuperValu admits that the Project Partner negotiations were arm's length and that the Letter of Intent "was jointly negotiated by sophisticated parties using legal counsel" (SuperValu's Resp. to AG's Third Set of Interrogatories No. 15).  Additionally, the parties were competitors throughout the negotiation process.  Even SuperValu's negotiator, Sheila Hagen, admits that she never completely trusted AG's negotiator.  The Court concludes that no special relationship arose that gave rise to a duty to disclose.

### d.    Conclusion

AG did not make any affirmative misrepresentation to SuperValu during the eight days following the board vote, and, because it was involved in an arm's-

length negotiation with a sophisticated competitor, it had no duty to avoid

omissions.  Further, as explained in Part III(B)(1)(d), SuperValu cannot prove that

AG's silence after the board vote caused damages to SuperValu.  Accordingly, the

Court grants summary judgment for AG on this claim.

### C.    SuperValu's Motion for Summary Judgment on AG's Affirmative Defenses

AG asserts a variety of affirmative defenses aimed only at Counts I and III of

SuperValu's First Amended Complaint.  Because the Court grants AG's motion for

summary judgment as to Counts I and III, SuperValu's partial summary judgment

motion on those affirmative defenses is moot.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.    Plaintiff SuperValu Inc.'s Motion for Partial Summary Judgment [Docket No. 77] is **DENIED AS MOOT**.

2.    Defendant Associated Grocers, Inc.'s Motion for Summary Judgment [Docket No. 82] is **GRANTED IN PART** and **DENIED IN PART** as follows:
   a.    Count I: Breach of Contract - Duty to Negotiate in Good Faith and Count III: Misrepresentation are **DISMISSED**.

   b.    Count II: Breach of Contract - Duty of Confidentiality & Nonuse remains.

Dated: March 22, 2006                    s /Michael J. Davis
                                         Judge Michael J. Davis
                                         United States District Court